UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UA LOCAL 13 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, ) | Civ. Action No. |
| ) | |
| ) | <u>CLASS ACTION</u> |
| Plaintiff, ) | |
| ) | COMPLAINT FOR VIOLATION OF THE |
| ) | FEDERAL SECURITIES LAWS |
| vs. ) | |
| ) | |
| THE WESTERN UNION COMPANY, ) | |
| HIKMET ERSEK, SCOTT T. SCHEIRMAN ) | |
| and RAJESH K. AGRAWAL, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff UA Local 13 Pension Fund ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and on information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements, U.S. Securities and Exchange Commission ("SEC") filings, press releases published by and regarding The Western Union Company ("Western Union" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of a class consisting of all persons and entities other than defendants who purchased or otherwise acquired the publicly traded securities of Western Union between February 24, 2012 and January 19, 2017, inclusive (the "Class Period"). Plaintiff seeks to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.       Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

3.       Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as defendants conduct business in this District and a significant portion of the defendants' actions, and the subsequent damages, took place within this District. Defendant Western Union also entered into a deferred prosecution agreement with the U.S. Department of Justice ("DOJ") and various additional governmental agencies in this District based on the acts that, in part, form the basis for this complaint. *See United States v. Western Union Co.*,

No. 17-cr-00011-CCC (M.D. Pa.); *Federal Trade Commission v. Western Union Co.*, No. 17-cv-00110-CCC (M.D. Pa.).

4.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

5.      Plaintiff UA Local 13 Pension Fund, as set forth in the accompanying Certification, purchased Western Union securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

6.      Defendant Western Union provides money movement and payment services worldwide.   The Company's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "WU."

7.      Defendant Hikmet Ersek ("Ersek") has been the Chief Executive Officer ("CEO") and President of Western Union since September 2010.

8.      Defendant Scott T. Scheirman ("Scheirman") served as the Chief Financial Officer ("CFO") and Executive Vice President of Western Union from September 2006 until January 2014.

9.      Defendant Rajesh K. Agrawal ("Agrawal") has been the CFO of Western Union since July 2014 and has been its Executive Vice President since November 2011.  Defendant Agrawal served as Interim CFO of Western Union from January to July 2014.

10.      Defendants Ersek, Scheirman and Agrawal are sometimes referred to herein as the "Individual Defendants."

11.      The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Western Union's quarterly reports, press releases, statements and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with

the Company, and their access to material non-public information available to them, but not to the public, the Individual Defendants knew, or were reckless in not knowing, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

12.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Western Union. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Western Union securities was a success, as it: (i) deceived the investing public regarding Western Union's prospects and business; (ii) artificially inflated the prices of Western Union securities; and (iii) caused plaintiff and other members of the Class to purchase Western Union securities at inflated prices.

## BACKGROUND

13.     Defendant Western Union provides money movement and payment services worldwide. The Company operates in three business segments: Consumer-to-Consumer ("C2C"), Consumer-to-Business ("C2B"), and Business Solutions. The C2C segment offers money transfer services, including walk-in money transfer, online money transfer, account-based money transfer and mobile money transfer, through a network of third-party agents using multi-currency and real-time money transfer processing systems. The C2B segment provides services to consumers to allow them to make one-time or recurring payments to other businesses. Additionally, the Company provides money orders for making purchases, paying bills and as an alternative to checks; and prepaid cards that allow consumers to load money or receive a direct deposit onto the card for use. The Business Solutions segment provides business-to-business payment solutions for cross-border and cross-currency transactions.

14.     Western Union has a global network of more than 500,000 agent locations in 200 countries, with approximately 90% of those locations outside the United States. The Company describes its C2C operations as the "core" of its business, and this operating segment accounted for approximately 79% of the Company's consolidated revenue in fiscal 2015. Western Union

- 3 -

generates revenue on its C2C transactions by charging a transfer fee and a currency exchange fee, if applicable. Agents generally receive a commission based on the percentage of revenue, with this commission paid to both the "send agent" (the agent that initiated the transaction) and the "receive agent" (the agent that paid the transaction).

15.     The C2C segment operates via three distinct brands: the Western Union brand, the Vigo brand and the Orlandi Valuta brand. Western Union describes its C2C services as "one interconnected global network" and separates the segment into five distinct geographic regions. The Vigo and Orlandi Valuta brands operate extensively in Mexico and Latin America.

16.     Western Union's C2C segment targets consumers who are unbanked or underserved by financial institutions, including migrants who need to send money back to their friends and families in their home countries. These funds, called remittances, are mostly spent on housing, food, clothing and durable consumer goods. Remittances sent from immigrants in wealthier countries are a staple source of income for many developing countries, including Mexico, where they recently surpassed oil as the largest foreign source of income.

17.     Many of Western Union's customers are unlikely to have access to traditional banking institutions, as they lack the money and/or the proper documentation to open a bank account. Moreover, the recipients of the funds are often located in rural villages in less developed countries. Accordingly, immigrants may turn to remittance companies such as Western Union as the only secure option for sending money. As a result, money transfer companies, such as Western Union, are able to charge more for their services than traditional banks. The United States is the largest send-side location in the world with U.S. revenues accounting for over 28% of Western Union's total revenue in fiscal 2015. Mexico is among the Company's largest recipient of remittance payments.

18.     Western Union is the dominant force in the remittance industry and, as such, has long enjoyed some of the highest profit margins in the industry, in some instances charging a 50% premium over rivals. Much of Western Union's success has been due to its ability to require many of its agents to operate under an exclusivity agreement, including agents operating under the Vigo and the Orlandi Valuta brands. In addition, Western Union often maintained a higher dollar

threshold at which consumers would be required to show identification in order to conduct a transaction, thus providing senders with a higher degree of anonymity than its competitors. Customers were willing to pay the higher fees for more anonymity and a significantly larger network of locations to send and receive funds.

19.     Given that Western Union's business involves sending money across country borders, compliance with anti-money laundering and other regulations is a significant concern for the Company.  Within the United States, Western Union is regulated by various state and federal laws, including the USA Patriot Act and the Bank Secrecy Act.  Store agents are required to maintain accurate records and file reports of suspicious activity, such as documenting efforts to split a single payment into smaller transactions or identifying large withdrawals.

20.     Stringent money-laundering controls at traditional banking institutions have largely kept drug dealers, consumer fraudsters and human traffickers from using the formal financial system, making wire transfer companies vulnerable to use for these improper purposes.  Wire transfers can be used by criminals on a virtually anonymous basis, and in certain locations, even if identification is required, individual clerks have been corrupted to accept almost any kind of identification.

**EVENTS LEADING UP TO THE CLASS PERIOD**

21.     In the years leading up to the Class Period, law enforcement agencies around the world contacted Western Union and its executives to raise concerns about the potential for the Company's services to be used in furthering money laundering, consumer fraud and other illegal schemes and practices.

22.     For example, the state of Arizona initiated an investigation against Western Union in 2001, alleging that the Company was not reporting suspicious activity, as it was required to do. Ultimately, on February 11, 2010, Western Union entered into a settlement agreement (the "Southwest Border Agreement") with the state of Arizona to extinguish the nearly decades-long investigation concerning Western Union's inability to prevent its services from being utilized to launder money or to facilitate other criminal activity.  The purpose of the Southwest Border Agreement was to prevent illegal money laundering by enhancing and better coordinating investigations and the prosecution of money laundering between the states along the U.S. and

Mexico border. The Southwest Border Agreement established new protocols for sharing wire transfer information, whereby Western Union would grant the states access to its transactional data so investigators could track trends in the flow of money transfers and look for suspicious activity; required payments from the Company to help secure the U.S. and Mexico border; and obligated the Company to implement enhancements in its compliance programs. According to the Company's annual report on Form 10-K filed with the SEC on February 25, 2011, "[t]he costs of the investments and the monitor [were then] expected to reach up to $23 million over the period from signing to 2013."

23. As detailed in a January 19, 2017 complaint filed by the Federal Trade Commission ("FTC") against the Company, in the years leading up to the Class Period, the Company and its corporate officers had been notified through numerous investigations about the misuse of the Company's services to further criminal money laundering, consumer fraud schemes and other illegal activities, including as follows:

- In or around 2002, multiple state Attorneys General issued subpoenas to Western Union in conjunction with their investigation of the use of Western Union's money transfer system by fraudulent telemarketers. In correspondence dated October 1, 2002, the Vermont Attorney General's Office informed Western Union about statistics regarding telemarketers in Quebec, Ontario, British Columbia, and Israel misusing Western Union's money transfer system for fraudulent activities.

- In or around November 2005, Western Union entered into an agreement with 47 states and the District of Columbia involving the use of Western Union's money transfer system by "'fraudulent telemarketers in and outside the United States'" (the "2005 Agreement"). The 2005 Agreement imposed a number of requirements upon Western Union, including warnings to consumers, agent training, closure of agents, development of a computerized system to identify likely fraud, and increasing anti-fraud staff. For example, the 2005 Agreement required that Western Union "'terminate those of its agents, subagents or locations, as the case may be, who are complicit in fraud-induced transfers or who knowingly ignore such fraud, or, if certain employees of the agent or subagent are the complicit or knowingly ignoring parties, insist upon termination of such employees as a condition to continued agent or subagent status.'" The 2005 Agreement was in effect for five years. Despite this agreement, as explained below, Western Union systematically failed to terminate many problematic agent locations, especially in countries outside of the United States and Canada.

- In or around September 2010, the Japan Financial Services Agency expressed concern to the Company about Japanese consumers sending fraud-induced money transfers to the United Kingdom and "'suspicious viewing/surfing of transactions in the United Kingdom, resulting in either Paid in Error (PIE) or Non Payment Claims [complaints about money transfers being paid to the wrong person or not being paid].'"

- Since at least June 2011, the Minnesota Attorney General's Office has been warning Western Union in correspondence directed to the attention of the President and CEO that "'each year thousands of consumers are defrauded through use of your company's services,'" and that, "'[g]iven your firm's apparently continuing inability or unwillingness to detect and prevent such wire transfer fraud, it would seem appropriate to'" issue refunds to consumers. This correspondence described the consumer complaints the Minnesota Attorney General had received from fraud victims. In response, Western Union typically refused to issue any refunds to the victims after the funds were paid out.

- In or around October 2011, multiple state Attorneys General issued subpoenas to Western Union in connection with investigations of fraudulent telemarketers' use of Western Union's money transfer system. The subpoena issued by Vermont stated that it had "'reason to believe that Western Union has provided substantial assistance to fraudulent telemarketers in the form of access to its money transfer system, despite knowing, or consciously avoiding knowing, of the fraud, in violation of the Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a).'"

- On or about November 29, 2011, Western Union personnel met with the Korea Financial Supervisory Services to discuss the regulator's concerns about consumer fraud involving Western Union's money transfer system and its requirement that Western Union put together a plan to alleviate consumer fraud.

- In February 2012, in response to a survey sent to law enforcement by Western Union, a Special Agent for the U.S. Secret Service warned Western Union that its services were "'widely used by Nigerian scammers and other criminal elements overseas'"; "'a person in America can easily be robbed by someone in a foreign country and there is almost no possibility to recover that fraud loss'"; its "'services are widely used for online scams in the US'"; and that Western Union "'is a complete and almost total safe haven for the criminal element to freely launder illegal proceeds without detection.'"

24.      Despite these warnings and the requirement that the Company take action to prevent criminal activity and money laundering, Western Union did not adequately address these issues. The Company subsequently admitted in a deferred prosecution agreement ("DPA")[1] with the DOJ, dated January 18, 2017, that:

(a)      From 2004 through December 2012, Western Union violated U.S. laws by (1) willfully failing to implement and maintain an effective anti-money laundering program that was designed to detect, report and prevent criminals from using Western Union to facilitate fraud, money

---

[1]      According to the DPA, "The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, and employees, as well as for certain conduct of its Agents, such as use of Western Union's money transfer system, as charged in the Information, and as set forth in the Statement of Facts attached hereto as Attachment A and incorporated by reference into this Agreement, and that the allegations described in the Information and the facts described in Attachment A are true and accurate."

laundering and other schemes; and (2) aiding and abetting fraudsters in their unlawful schemes by remaining in business with agent locations that facilitated the unlawful fraud scheme.

(b)     Western Union's conduct included employees (1) repeatedly identifying Western Union agent locations involved in or facilitating fraud-related transactions but knowingly failing to take effective corrective action; (2) repeatedly identifying Western Union agents involved in or facilitating unlawful structuring but knowingly failing to take effective corrective action; (3) failing to adequately implement and maintain effective policies and procedures to discipline, suspend, terminate or take effective corrective action against Western Union agent locations that repeatedly violated the Bank Secrecy Act and other statutes or Western Union anti-money laundering or anti-fraud policies; (4) modifying compliance reviews or results so that agents with severe compliance failures would not face disciplinary action such as suspension or termination as required by Western Union policies or practices; (5) failing to take effective action to control transactions with characteristics indicative of illegal gaming; or (6) failing to file Suspicious Activity Reports identifying Western Union agents as suspicious actors.

(c)     Fraudsters relied on Western Union's money transfer system to receive fraud and other criminal proceeds worldwide from victims in the United States. Western Union's conduct, including its failure to take effective corrective actions in a timely fashion, contributed to the success of the fraudsters' schemes.

(d)     This conduct occurred in various Western Union offices and Western Union agent locations in the United States and around the world, including, in particular, through wires sent from the Middle District of Pennsylvania in furtherance of the fraudulent scheme that Western Union aided and abetted.

25.     The Company's statements leading up to the Class Period concealed this improper conduct.

26.     On February 7, 2012, Western Union issued a press release reporting its 2011 full year and fourth quarter earnings results. The Company reported net income of $452.3 million, or $0.73 diluted earnings per share ("EPS"), and revenue of $1.4 billion for the fourth quarter ending December 31, 2011. Further, the Company reported net income of $1.165 billion, or $1.84 diluted

EPS, and revenue of $5.5 billion for the full year ended December 31, 2011. Significantly, the Company provided its outlook for 2012, stating it was then on track to achieve constant currency revenue growth in the range of 6% to 8% and expected C2C constant currency revenue trends to be similar to the fourth quarter of 2011. The Company also forecast EPS in the range of $1.65 to $1.70 per share for fiscal 2012. The release stated, in pertinent part, as follows:

> Western Union President and Chief Executive Officer Hikmet Ersek commented, "We realized many accomplishments in 2011. We exceeded our initial outlook for earnings per share, and delivered our highest full year revenue growth rate since 2008. Each of our consumer-to-consumer regions grew, with strong performance in electronic channels."

*     *     *

> Ersek added, "In 2012 our focus is on execution against the strategic roadmaps. While there are some near-term market challenges in parts of the world, the long-term opportunities for revenue growth and margin expansion are strong."

27.     That same day, Western Union hosted a conference call for analysts, media representatives and investors. In his prepared remarks, defendant Ersek touted the Company's "***strong global compliance capabilities***" and "***strong foundation with our . . . regulatory and compliance capabilities***."[2] Defendant Ersek made additional statements about the Company's compliance procedures, including, in pertinent part:

> ***[I]f you look at our Mexico business, it's a little bit affected by ongoing compliance procedure***, which we are changing, especially from southwest [of] the border. As you recall we had an agree [sic] to 2009, to work with an independent monitor on our compliance activities. And that we see that some of the activity has been impacted our business. And we also are looking at 2012, of our model, our practices in Mexico. We are in the process of reviewing some agent agreement, and changing our operating model . . . . ***In Mexico, we are going to upgrade our compliance-related changes. We are going to be more – we really want to be the industry standard, and the highest standard of industry, I think we really want to be the highest there. So I believe that we have the right approach there.*** And just to put the things in perspective, as you know, none of our business, Mexico is not larger than 6% in 2011 of our business, right, so –

*     *     *

> [W]ith our compliance ones, we are really on it. I think Western Union is, I believe has the focus, and is a high priority in our environment. I think we are really setting the industry standard, and my aim is with our General Counsel, and with our anti-money laundering activities to setup, are a very high priority, that is the first thing. . . . I feel quite confident that we have the right structure to meet the regulatory environment needs.

---

[2]   Emphasis has been added throughout unless otherwise noted.

28.     On February 15, 2012, defendants Ersek and Scheirman attended the Goldman Sachs Group Inc. Technology and Internet Conference.   On the call, defendant Scheirman touted the Company's compliance efforts as a competitive advantage, stating that "often others underestimate the compliance capabilities."  He continued, "When we start moving money across border, *you've got to be very sophisticated with the compliance, which we are*."

29.     On February 21, 2012, Western Union issued a press release touting a "new . . . money transfer agreement" with Grupo Elektra, S.A.B. de C.V., one of Latin America's leading financial services company and specialty retailers. The release stated the "agreements reaffirm Grupo Elektra and *Western Union's solid commitment to serve millions of consumers throughout Mexico*" and emphasized the breadth and dependability of the Company's North American operations: "Western Union, together with Vigo and Orlandi Valuta, has more than 50,000 points of sale in the US."

30.     These statements regarding Western Union's business and prospects, the impact of compliance-related costs on Western Union's operations and the claim that Western Union was taking the "right approach" to obtain the "highest standard" of regulatory compliance in the industry remained uncorrected in the market at the start of the Class Period.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

31.     The Class Period begins on February 24, 2012.  On that day, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2011 (the "2011 10-K"), which included the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2011.  The 2011 10-K was signed by defendants Ersek and Scheirman.

32.     The 2011 10-K stated that Western Union "believe[s] our fraud prevention efforts are effective and comply with applicable law and best practices," stating in pertinent part:

> The remittance industry has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others.  While *we believe our fraud prevention efforts are effective and comply with applicable law and best practices*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem.  Our failure to continue to help prevent

- 10 -

such frauds or a change in laws or their interpretation could have an adverse effect on our business, financial condition and results of operations.

33.     The 2011 10-K also touted Western Union's global compliance programs, including its anti-money laundering program and its practice of continuing "to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices," stating in pertinent part:

> *We have developed and continue to enhance our global compliance programs, including our anti-money laundering program, which comprises policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices*. These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance. Our money transfer network operates through third-party agents in most countries, and, therefore, there are limitations on our legal and practical ability to completely control those agents' compliance activities.

34.     The 2011 10-K also stated in reference to its "regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy" – that "Western Union is compliant with its regulatory responsibilities," stating in pertinent part:

> *These regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy* – may conflict, and the law in these areas is not consistent or settled. While *we believe that Western Union is compliant with its regulatory responsibilities*, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

35.     On March 13, 2012, defendant Scheirman attended the Credit Suisse Global Services Conference. In response to a participant question about how the Company would maintain its pricing advantages in the face of competition, Scheirman stated that Western Union's "*compliance programs*" were "*really competitive strengths for us*."

36.     On April 24, 2012, Western Union issued a press release reporting its first quarter 2012 earnings results. The Company reported net income of $247.3 million, or $0.40 diluted EPS, and revenue of $1.4 billion for the quarter ending March 31, 2012. Significantly, the Company maintained its fiscal 2012 outlook provided on February 7, 2012. The release stated, in pertinent part, as follows:

Western Union President and Chief Executive Officer Hikmet Ersek commented, "Overall, we started off the year in line with our outlook. Our Consumer-to-Consumer segment growth accelerated compared to the fourth quarter, as strength in North America and the Middle East and Africa offset some expected softness in the Europe and CIS region. We further expanded our global network, including increasing our U.S. banking and European retail presence, and in April we reached 500,000 Agent locations across the world."

37.   After releasing its first quarter 2012 results on April 24, 2012, Western Union hosted

a conference call for analysts, media representatives and investors.  During the conference call,

defendants Scheirman and Ersek made statements about the Company's compliance procedures,

stating, in pertinent part, as follows:

[SCHEIRMAN:] Turning to North America, the region's revenues increased 5% compared to 2% last quarter.  US outbound in Canada strengthened while domestic money transfer continues to have solid momentum with revenue growth of 9% on transaction growth of 12% in the quarter. Mexico improved from last quarter with both revenue and transactions increasing 3% in the quarter.  As we mentioned in February, we are still determining and implementing changes to our compliance-related practices in Mexico. *Although we still expect to see some negative impact on the Vigo and Orlandi Valuta brands as we evolve our business model and compliance-related practices throughout the year, our Western Union brand is performing well*.

\*     \*     \*

[ANALYST:]   Can you just quickly update us on the compliance situation in Mexico?  How that is progressing and by when do you expect to be in some compliance?

[ERSEK:] Yes, I think as we mentioned in our February earnings call, we have been working with the appointed external monitor very close to determine and appreciate changes, which we have outlined in our agreement and improvements about anti-money laundering oversight along all the border. I think we did do some changes last year on the Vigo and on Orlandi Valuta brands and also on our brands ID threshold changes, which have impacted our high principal transfers, which we still see it.  Currently, we are also investing on the new technology changes and we have other many projects on the way.  We believe that these changes have affected our principal and market share in 2012, but we also believe that these changes are needed.  *These changes are happening and we are going to be, as an industry leader, we're implementing the changes and that will also impact all the industry long-term*.

38.   Later in the call, Scheirman characterized the Company's "*compliance capabilities*"

as allowing it to increase and maintain its global market share and stated that these purported

capabilities would "*play very well to globalizing this space over the coming years*."

39.   On May 1, 2012, Western Union filed its quarterly financial report on Form 10-Q

with the SEC for the period ended March 31, 2012, maintaining that the "costs of the investments in

the Company's [compliance] programs and for the monitor [were still then] expected to reach up to $23.0 million over the period from signing to 2013." The Form 10-Q was signed by defendants Ersek and Scheirman.

40.    On May 9, 2012, Western Union hosted an Investor Day conference call for analysts, media representatives and investors. During their presentation, defendants Ersek and Scheirman made positive statements about the Company's compliance and regulatory capabilities. For example, defendant Ersek dedicated a portion of his prepared remarks to detailing the purported strengths of Western Union's compliance and regulatory capabilities, and specifically its anti-money laundering efforts, stating in part:

> ***Our fourth competitive advantage is our global anti-money laundering regulatory capabilities***. The regulations around our business are really highly complex. And we have regulatory complexity in all our markets. ***We have to comply with various acts and interdiction lists around the world, as well as maintain a very active risk management system to detect and deter potential money laundering activities***.
>
> It sounds complex and, indeed, it is complex, but ***we see that as a competitive advantage as we comply with various acts and interdiction lists around the world in 200 countries***. And the regulatory environment is changing constantly in different parts of the world. Let me give you an example.
>
> A recent example here in the US actually with money transfer providers now have to adopt to conform with the rules of Dodd-Frank Act. Implementation and operation of the new disclosure requirements under Dodd-Frank is really complex. ***And, although, there are going to be some costs for to [sic] implement that, we view [it] as a competitive advantage***.
>
> We have the technology and resources available to meet the installation needs across our agents that are based in the US while others may – don't have the resources and the technology.
>
> ***To protect our customers, our brand, to comply with rules and regulations, globally, we dedicate about 600 employees around the globe to these efforts and we spend yearly about $60 million on anti-money laundering regulatory environment***.

41.    Defendant Scheirman followed along this same theme, stating in his prepared remarks that Western Union's "***compliance and regulatory capabilities***" were among its "***strengths***," which would "***deliver strong returns***" for shareholders in the coming years. He later stated that "***we believe our compliance capabilities on a long-term basis are very much of a competitive advantage as we move forward***."

42.     Similarly, other Company representatives stated that Western Union maintained robust compliance standards.  For example, Chetan Mehra, director of an Indian money transfer affiliate, Weizmann Forex Limited, stated that Western Union had "*high compliance standards*"; defendant Agrawal characterized the Company's "*compliance capability*" as a "*key asset*" for global growth; Diane Scott, Western Union's Chief Marketing Officer, pointed to the Company's "*deep understanding*" of "*compliance and regulatory environments*" around the world; and Mike Salop, Western Union's Senior Vice President of Investor Relations, touted the Company's "*robust compliance in [anti]-money laundering policies and processes in place*."

43.     Mr. Salop went so far as to specifically discredit a government investigation into potential fraud by a former Company agent, stating: "*We are not aware of any evidence to suggest that the company or any of us employees knowingly engaged in any conduct with this former agent that would constitute a violation of the law*."

44.     On May 29, 2012, Western Union issued a press release warning consumers to be "[w]ary of [s]cammers with '[e]asy [m]oney' [o]ffers."  Instead of disclosing the Company's complicity in consumer frauds, the release stated: "*Western Union provides a trusted and reliable way for people to send money to family members and friends*."

45.     On June 12, 2012, Western Union attended a William Blair & Co LLC Growth Stock Conference call for analysts, media representatives and investors.  During the presentation, defendant Ersek once again represented that the Company's compliance procedures were a competitive "strength," and in particular touted Western Union's anti-money laundering efforts as a means of giving customers "trust" in the Company:

> *One of our very strong competitive advantage[s] is our regulatory environment, our regulatory and anti-money-laundering competency capabilities. It scares to death the competition to enter this market, the regulatory environment*. And I always say – I know it's sometimes tough, but I always say it's good that the regulatory environment, that *we as Western Union have these capabilities to serve the customers and give the trust to the customers they believe at Western Union*.

> And we spend about $60 million yearly on the anti-money-laundering activities.  We have about 600 employees really looking after the regulatory environment on the day to day.  And don't forget, we are not only regulated in the US or in the UK; we are regulated in 200 countries.  We do have different regulatory environment in 200 countries and Western Union has the competency to serve the customers.  And it's not easy to get a money transfer license in Tajikistan.  It's not

easy to have a money license in Gabon and Brazil or other states I'm talking about. *So it's a competitive advantage for Western Union and we are very proud of that*.

46.    In response to an analyst's question about how Western Union would maintain its competitive advantage, defendant Ersek again highlighted the Company's regulatory efforts: "*You have to get the regulatory environment – somebody has to do that. It's not easy to do that. You have to [go down to] money laundering – somebody has to do that. . . . So that has been definitely something we are very proud*."

47.    On July 24, 2012, Western Union issued a press release announcing its second quarter 2012 financial results.  The Company reported net income of $271.2 million, or $0.44 diluted EPS, and revenue of $1.4 billion for the quarter ending June 30, 2012.  Significantly, the Company again maintained its fiscal 2012 revenue outlook provided on February 7, 2012, but raised its EPS outlook from a range of $1.65 to $1.70 per share to a range of $1.68 to $1.72 per share.  The Company did reduce its operating margin due to "increased compliance related costs," but did not specify what those costs entailed.  The release also emphasized, in pertinent part, as follows:

> Western Union President and Chief Executive Officer Hikmet Ersek commented, "*Overall we are on track for our full year financial outlook*.  In the quarter, our core consumer money transfer business, which represents over 80% of Company revenue, delivered *solid 3% constant currency growth with consistent margins*.  The Middle East and Africa, Asia Pacific, and Latin America regions and on-line money transfer performed well, more than offsetting the impact of consumer slowdowns in Southern Europe and some expected softness in certain countries.  *The global diversification of our portfolio and resiliency of our consumers continue to drive revenue growth and strong cash flow, even in a challenging economic environment*."

48.    After releasing its second quarter 2012 results on July 24, 2012, Western Union hosted a conference call for analysts, media representatives and investors.  Defendant Ersek began his prepared remarks by stating the Company's "*global compliance capabilities*" gave it a "*strong*" foundation.  Defendant Scheirman stated on the call that the compliance costs thus far were as expected:

> Mexico revenue declined 7% and transactions decreased 5% in the quarter. As you recall, *we anticipated revenue climbs and share losses in Mexico* this year, as we implement changes to our compliance related practices and business model.
>
> \*        \*        \*
>
> We have also adjusted our full-year 2012 outlook for operating margin [to] reflect higher spending for other compliance costs, primarily relating to the

Southwest Border Agreement. [We're] working on dozens of projects around enhanced risk controls that have continued to evolve and we have increased our projected spend in 2012 primar[ily] for IT development and higher personnel costs.

We expect global spending on compliance activities over the next couple of years will not change significantly from the 2012 levels as the breadth and complexity [of] requirements and sustainability around the globe continues to expand. *But we view our ability to adapt to this environment as a long-term competitive advantage*.

49.     Defendant Ersek stated, in response to an analyst's question about concerns regarding pricing and compliance costs, that the Company was "*very focused here and we are very serious*" about "*upgrading our compliance*." He continued: "*It's a competitive advantage, long-term*," and "I think we are investing heavily here to be, really I think as an industry leader, we are setting the tone here and I think we are very focused here and I see that as definitely a competitive advantage." Later in the call, he reiterated, "*As the industry leader, obviously, we are very active here, upgrading, investing heavily on that.*" He also specifically commented on Mexico, rejecting suggestions from an analyst that they were implementing "turnaround strategies": "In Mexico, it's more about upgrading our compliance in the Southwest border and other areas and setting the industry standards that long-term we are meeting the standard."

50.     Defendant Scheirman went one step further, saying the Company's "*goal is always to comply with the letter and the spirit of the law and we will continue to drive that direction*." He also commented on the changes following the enhanced compliance efforts in Mexico.

51.     On October 30, 2012, Western Union issued a press release announcing disappointing third quarter 2012 financial results. The Company reported net income of $269.5 million, or $0.45 diluted EPS, and revenue of $1.4 billion for the third quarter ending September 30, 2012. Significantly, the Company now reduced its 2012 revenue, operating margin and EPS outlook. The Company also announced a series of strategic initiatives and price cutting measures, stating that, as a result, 2013 GAAP operating income may decline 10% to 15% from 2012 levels. In addition, the release stated that the Company's Executive Vice President and President of Global Consumer Financial Services had left the Company. The release stated that the Company's C2C revenues had decreased 4% on a reported basis largely as a result of compliance changes required by the Southwest Border Agreement. North American revenue had dropped 8% from the prior year period,

primarily due to the impact of compliance-related actions affecting the Vigo and Orlandi Valuta brands serving the United States to Mexico and various Latin American countries.

52.     As a result of these partial disclosures, the price of Western Union stock dropped $5.20 per share to close at $12.73 per share on October 31, 2012, a decline of 29% on heavy trading volume of 63 million shares.

53.     However, because defendants failed to disclose Western Union's willful failure to prevent money laundering, consumer fraud schemes, and other illegal activities across its global operations, the prices of the Company's securities remained artificially inflated.  Rather than disclosing the truth, on the conference call defendants provided additional false and misleading statements regarding the Company's compliance efforts.  For example, defendant Ersek stated that *"we are investing more in being an industry leader"* in regulatory compliance.  He continued, *"We are the industry leader.  We are leading that and I think we are protecting our customer."*  Similarly, he stated, "we believe it is our responsibility to maintain our industry leadership by implementing feature-rich compliance practices to protect our customers and agents around the world."  Defendant Ersek also represented that the Company could maintain its price premium even while complying with regulations: *"We're going to stay premium price. And because we have the 500,000 locations, we are in 200 countries, we have a great compliance, we have a great brand, I think the premier price will continue."*

54.     On November 6, 2012, Western Union filed its quarterly financial report on Form 10-Q with the SEC for the period ended September 30, 2012.  The Form 10-Q, signed by defendants Ersek and Scheirman, reported that the Company had "Enhanced Regulatory Compliance," stating in pertinent part:

> We regularly review our compliance programs. In connection with that review and growing global regulatory complexity, and as we dialogue with governmental and regulatory authorities, *we have made, and continue to make, enhancements to our processes and systems designed to detect and prevent money laundering, terrorist financing, fraud and other illicit activity*. These enhancements, along with other enhancements to improve consumer protection related to the Dodd-Frank Act and other matters, have resulted in, and in coming quarters we expect them to continue to result in, changes to certain of our business practices and increased costs. Some of these changes have had, and we believe will continue to have, an adverse effect on our business, financial condition and results of operations.

55.     On November 7, 2012, defendants Ersek and Scheirman attended the Citi Financial Technology Conference.  At the conference, these defendants represented that the Company's compliance-related costs and pricing challenges would be temporary and designed to maintain an "industry lead[ing]" compliance program.  For example, defendant Scheirman blamed the Company's compliance issues on "glob[al]" trends rather than the Company's own willful conduct in failing to prevent money laundering and other illegal activities: "*We now spend over $100 million a year on compliance and just given how the compliance requirements are just generally tightening around the globe,* that's one spend we'll probably continue to increase as we move forward."  Defendant Ersek followed up by stating that "*compliance is important.  We're going to continue to invest there and it's going to be industry standard. . . .  It's also competitive advantage.*"  Later, Ersek would state that Western Union was an "*industry leader in the sector*" who "*set the standards.*"

56.     On February 12, 2013, the Company issued a press release announcing its fiscal year and fourth quarter 2012 financial results.  In the release, defendant Ersek was quoted as saying, "'*We are confident the strategic actions we are implementing in 2013 will position us well for the future and drive revenue and profit growth in 2014 and beyond.*'"

57.     The Company held an earnings call with investors that same day.  On the call, defendants once again represented that Western Union had turned the corner on regulatory issues and that there were no more significant revelations about the Company's compliance failings likely to come out.  The following exchange with an analyst illustrates these representations:

> [ANALYST]:  What gives you confidence that there's nothing in the compliance, or something that stings you that you don't know about? One of the ways to think about it is there's probably – is there anything out there that could be as large as the situation that happened with Vigo and Orlandi Valuta that could have that kind of an impact on price?
>
> [ERSEK]:  . . . I really believe that we're going to come to 1% to 3% pricing environment. The regulatory environment is challenging, it's obviously we are very in regulated market. But all our investments, about $100 million a year we invest in anti-money laundering and compliance are really putting us as an industry standard. *Being a market leader puts us in an industry standard and we want to be a best-in-class and see that as a long-term competitive advantage. I think regulatories [sic] are looking also at us and we do have a duty to satisfy customer needs and we are working very hard on that.*

- 18 -

58.     On February 22, 2013, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2012 (the "2012 10-K"), which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2012. The 2012 10-K was signed by defendants Ersek and Scheirman.

59.     The 2012 10-K stated that Western Union "believe[s] our fraud prevention efforts are effective and comply with applicable law," stating in pertinent part:

> The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While *we believe our fraud prevention efforts are effective and comply with applicable law*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers during economically difficult times, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

60.     The 2012 10-K also touted Western Union's global compliance programs, including its anti-money laundering program and its practice of continuing "to adapt [its] business practices and strategies to help . . . comply with current and evolving legal standards and industry practices," stating in pertinent part:

> We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements. These programs include dedicated compliance personnel, training and monitoring programs, suspicious activity reporting, regulatory outreach and education, and support and guidance to our agent network on regulatory compliance.

61.     The 2012 10-K also stated in reference to the Company's "regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy" – that "Western Union is compliant with its regulatory responsibilities," stating in pertinent part:

> These regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy – may conflict, and the law in these areas is not consistent or settled. While we believe that Western

Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

62.     On October 29, 2013, the Company reported its third quarter 2013 financial results and downgraded its fiscal 2014 financial guidance. Western Union reported operating income of $869 million in the first nine months of 2013, down 17% from the same period the prior year. Compared with the third quarter of 2012, operating profit for the third quarter of 2013 was down 19%. The Company also said that it did not expect any operating income growth in fiscal 2014 because compliance costs would rise to up to 4.5% of revenue in fiscal 2014. Specifically, Western Union stated, in pertinent part, as follows:

> While the Company has increased its investments in compliance considerably in recent years, significant additional investment in 2014 is now anticipated in light of the current environment and our internal reviews of the increasingly complex and demanding global regulatory requirements.
>
> . . . Western Union expects its compliance related expenses to increase from approximately 2.5% of revenue in 2013 to a range of approximately 3.5% to 4.5% of revenue in 2014, based on preliminary reviews of the programs. Although the Company is in the early stages of its 2014 budgeting process, it still expects revenue growth in 2014, but no longer expects growth in operating profit due to both these incremental costs as well as potential business impact from new compliance procedures.

63.     On these partial disclosures, the price of the Western Union stock again declined, falling $2.39 per share – more than 12% – on abnormally high trading volume of 55 million shares traded, or 8.6 times the average daily trading volume over the preceding ten days.

64.     The price of the Company's shares declined further following the November 15, 2013 announcement that defendant Scheirman had resigned, and the November 18, 2013 announcement that, following a review of the Company's operating profile, Moody's Investors Service had downgraded Western Union's senior unsecured rating to Baa2 from Baa1, citing, in large part: (i) the Company's significant compliance costs; (ii) that Western Union had given a constrained outlook regarding its 2014 operating profit, stating it did not expect any operating profit growth in 2014 due to the higher compliance costs; and (iii) that Western Union's traditional money transfer business suffered from competitive pricing pressures and emerging payment technologies.

65.     Despite these declines, the price of Western Union stock remained artificially inflated because defendants failed to disclose Western Union's willful failure to prevent money laundering, consumer fraud schemes and other illegal activities across its global operations.

66.     On February 24, 2014, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2013 (the "2013 10-K"), which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2013.  The 2013 10-K was signed by defendants Ersek and Agrawal.

67.     The 2013 10-K stated that Western Union "believe[s] our fraud prevention efforts are effective and comply with applicable law," stating in pertinent part:

> The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While *we believe our fraud prevention efforts are effective and comply with applicable law*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem.  Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

68.     The 2013 10-K also emphasized Western Union's global compliance programs, including its anti-money laundering program, and touted Western Union's practice of continuing "to adapt [its] business practices and strategies to help . . . comply with current and evolving legal standards and industry practices," stating in pertinent part:

> We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements.  In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.

69.     The 2013 10-K also stated in reference to the Company's "regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy" – that "Western Union is compliant with its regulatory responsibilities," stating in pertinent part:

- 21 -

These regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy – may conflict, and the law in these areas is not consistent or settled. While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

70.    On February 20, 2015, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2014 (the "2014 10-K"), which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2014. The 2014 10-K was signed by defendants Ersek and Agrawal.

71.    The 2014 10-K stated that Western Union "believe[s] our fraud prevention efforts comply with applicable law," stating in pertinent part:

The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While *we believe our fraud prevention efforts comply with applicable law*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem. Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition and results of operations.

72.    The 2014 10-K also emphasized Western Union's global compliance programs, including its anti-money laundering program, and touted Western Union's practice of continuing "to adapt [its] business practices and strategies to help . . . comply with current and evolving legal standards and industry practices," stating in pertinent part:

We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements. In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.

73.    The 2014 10-K also stated in reference to the Company's "regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the

individual's right to privacy" – that "Western Union is compliant with its regulatory responsibilities," stating in pertinent part:

> These regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy – may conflict, and the law in these areas is not consistent or settled. While we believe that Western Union is compliant with its regulatory responsibilities, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

74.    On February 19, 2016, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2015 (the "2015 10-K"), which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2015. The 2015 10-K was signed by defendants Ersek and Agrawal.

75.    The 2015 10-K stated that Western Union "believe[s] our fraud prevention efforts comply with applicable law," stating in pertinent part:

> The remittance industry, including Western Union, has come under increasing scrutiny from government regulators and others in connection with its ability to prevent its services from being abused by people seeking to defraud others. While *we believe our fraud prevention efforts comply with applicable law*, the ingenuity of criminal fraudsters, combined with the potential susceptibility to fraud by consumers, make the prevention of consumer fraud a significant and challenging problem.  Our failure to continue to help prevent such frauds and increased costs related to the implementation of enhanced anti-fraud measures, or a change in fraud prevention laws or their interpretation or the manner in which they are enforced could have an adverse effect on our business, financial condition, results of operations, and cash flows.

76.    The 2015 10-K contained similar representations about Western Union's global compliance programs, including its anti-money laundering program, as had the 2014 10-K, including that it was continuing "to adapt [its] business practices and strategies to help . . . comply with current and evolving legal standards and industry practices," stating:

> We have developed and continue to enhance our global compliance programs, including our anti-money laundering program comprised of policies, procedures, systems and internal controls to monitor and to address various legal and regulatory requirements.  In addition, we continue to adapt our business practices and strategies to help us comply with current and evolving legal standards and industry practices, including heightened regulatory focus on compliance with anti-money laundering or fraud prevention requirements.

77.     The 2015 10-K again stated the Company had complied with Western Union's "regulatory responsibilities in all material respects," stating in pertinent part:

> *These regulatory goals – the prevention of money laundering, terrorist financing and identity theft and the protection of the individual's right to privacy* – may conflict, and the law in these areas is not consistent or settled. While *we believe that Western Union is compliant with its regulatory responsibilities in all material respects*, the legal, political and business environments in these areas are rapidly changing, and subsequent legislation, regulation, litigation, court rulings or other events could expose Western Union to increased program costs, liability and reputational damage.

78.     On May 3, 2016, Western Union reported disappointing first quarter 2016 EPS that fell below analysts' expectations. The Company reported that revenues and operating margins had also declined for the quarter after the Company implemented substantial compliance reforms. A Compass Point research analyst commenting on the results noted that "*Bears say . . . compliance costs will permanently impair margins*."

79.     On these partial disclosures, shares of Western Union fell $0.99 per share, or nearly 5%, over two trading days to close at $18.84 per share on May 5, 2016, damaging investors. Despite this decline, the price of Western Union shares remained artificially inflated because defendants failed to disclose Western Union's willful failure to prevent money laundering, consumer fraud schemes and other illegal activities across its global operations.

80.     Defendants' statements referenced above in ¶¶31-51, 53-62, 64 and 66-78 were materially false and misleading when made because they failed to disclose the following adverse facts, which were known to defendants, or recklessly disregarded by them:

(a)     that Western Union's fraud prevention efforts did not adequately comply with applicable laws;

(b)     that Western Union willfully failed to maintain an effective anti-money laundering program;

(c)     that Western Union aided and abetted wire fraud;

(d)     that, for at least five years, Western Union knew of agents structuring transactions designed to avoid the reporting requirements of the Bank Secrecy Act;

(e)     that Western Union was not compliant with its regulatory responsibilities;

(f)      that between 2004 and 2012, Western Union violated U.S. laws – the Bank Secrecy Act and anti-fraud statutes – by processing hundreds of thousands of transactions for Western Union agents and others involved in an international consumer fraud scheme;

(g)      that Western Union could not maintain its competitive premium pricing position while implementing effective regulatory and compliance policies;

(h)      that thousands of Western Union agents were not in compliance with the Company's regulatory requirements;

(i)      that Western Union knew of but failed to take corrective action against Western Union agents involved in or facilitating fraud-related transactions; and

(j)      that between January 2004 and August 2015, Western Union received over 550,000 complaints about fraud-induced money transfers, totaling more than $632 million.

81.      Then, on January 19, 2017, *The Wall Street Journal* published an article stating that Western Union "has agreed to pay $586 million to resolve U.S. criminal and civil charges that it failed to effectively police customers who were potentially using its services to engage in fraud." The article stated:

**Western Union to Pay $586 Million to Resolve Criminal, Civil Charges**

Prosecutors agree to drop criminal charges if the money-transfer company improves its compliance program

\*      \*      \*

Money-transfer company ***Western Union Co. has agreed to pay $586 million to resolve U.S. criminal and civil charges that it failed to effectively police customers who were potentially using its services to engage in fraud***, authorities said Thursday.

The company entered into a "deferred prosecution" agreement with the Justice Department and settled related civil claims from the Federal Trade Commission.

Under the deal, prosecutors agreed to defer and drop criminal charges against the company if it improves its compliance program. They could pursue a prosecution should the company fail to live up to its end of the bargain, but that rarely occurs.

In the agreement, Western Union admitted it failed to maintain an effective anti-money-laundering program and it aided and abetted wire fraud.

The agreement follows a series of prosecutions since 2001 of Western Union agents who were convicted of working with criminals to defraud people through mass-marketing schemes.

It also follows a $94 million settlement in 2010 between Western Union and Arizona, along with three other states, over money-laundering lapses, under which it agreed to improve its monitoring systems.

82.    Also on January 19, 2017, the U.S. Department of Justice issued a release, entitled

"Western Union Admits Anti-Money Laundering and Consumer Fraud Violations, Forfeits $586

Million in Settlement with Justice Department and Federal Trade Commission," stating:

**Western Union Admits Anti-Money Laundering and Consumer Fraud Violations, Forfeits $586 Million in Settlement with Justice Department and Federal Trade Commission**

Company also Agrees to Implement Anti-Fraud Program and Enhanced Compliance Obligations in Agreements with Federal Authorities

*The Western Union Company (Western Union), a global money services business headquartered in Englewood, Colorado, has agreed to forfeit $586 million and enter into agreements with the Justice Department, the Federal Trade Commission (FTC), and the U.S. Attorney's Offices* for the Middle District of Pennsylvania, the Central District of California, the Eastern District of Pennsylvania and the Southern District of Florida. *In its agreement with the Justice Department, Western Union admits to criminal violations including willfully failing to maintain an effective anti-money laundering (AML) program and aiding and abetting wire fraud.*

Acting Assistant Attorney General David Bitkower of the Justice Department's Criminal Division; FTC Chairwoman Edith Ramirez; U.S. Attorney Bruce D. Brandler of the Middle District of Pennsylvania; U.S. Attorney Eileen M. Decker of the Central District of California; Acting U.S. Attorney Louis D. Lappen of the Eastern District of Pennsylvania; U.S. Attorney Wifredo A. Ferrer of the Southern District of Florida; Inspector in Charge David W. Bosch of the U.S. Postal Inspection Service (USPIS) Philadelphia Division; Assistant Director in Charge Deirdre Fike of the FBI's Los Angeles Field Office; Chief Richard Weber of Internal Revenue Service-Criminal Investigation (IRS-CI); Special Agent in Charge Marlon V. Miller of U.S. Immigration and Customs Enforcement's Homeland Security Investigations (HSI) Philadelphia; and Special Agent in Charge Stephen Carroll of the Office of Inspector General for the Board of Governors of the Federal Reserve System and the Consumer Financial Protection Bureau (FRB-CFPB OIG) Eastern Region made the announcement.

"As this case shows, wiring money can be the fastest way to send it – directly into the pockets of criminals and scam artists," said Acting Assistant Attorney General Bitkower. "Western Union is now paying the price for placing profits ahead of its own customers. Together with our colleagues, the Criminal Division will both hold to account those who facilitate fraud and abuse of vulnerable populations, and also work to recoup losses and compensate victims."

"Western Union owes a responsibility to American consumers to guard against fraud, but *instead the company looked the other way, and its system facilitated scammers and rip-offs*," said Chairwoman Ramirez. "The agreements we are announcing today will ensure Western Union changes the way it conducts its business and provides more than a half billion dollars for refunds to consumers who were harmed by the company's unlawful behavior."

- 26 -

"The U.S. Attorney's Office for the Middle District of Pennsylvania has a long history of prosecuting corrupt Western Union Agents," said U.S. Attorney Brandler.  "Since 2001, our office, in conjunction with the U.S. Postal Inspection Service, *has charged and convicted Western Union Agents in the United States and Canada who conspired with international fraudsters to defraud tens of thousands of U.S. residents via various forms of mass marketing schemes*.  I am gratified that the deferred prosecution agreement reached today with Western Union ensures that $586 million will be available to compensate the many victims of these frauds."

"*Our investigation uncovered hundreds of millions of dollars being sent to China in structured transactions designed to avoid the reporting requirements of the Bank Secrecy Act, and much of the money was sent to China by illegal immigrants to pay their human smugglers*," said U.S. Attorney Decker.  "In a case being prosecuted by my office, a Western Union agent has pleaded guilty to federal charges of structuring transactions – *illegal conduct the company knew about for at least five years*.  Western Union documents indicate that its employees fought to keep this agent – as well as several other high-volume independent agents in New York City – working for Western Union because of the high volume of their activity. This action today will ensure that Western Union effectively controls its agents and prevents the use of its money transfer system for illegal purposes."

"Western Union's failure to comply with anti-money laundering laws provided fraudsters and other criminals with a means to transfer criminal proceeds and victimize innocent people," said Acting U.S. Attorney Lappen.  "*Western Union has agreed to forfeit $586 million, the largest forfeiture ever imposed on a money services business, and has agreed to take specific steps to ensure that it complies with the law in the future*.  This office will continue to vigorously enforce the anti-money laundering laws and regulations, which are necessary to prevent those engaged in fraud, terrorism, human trafficking, drug dealing and other crimes from using companies like Western Union to further their illegal activity."

"*Western Union*, the largest money service business in the world, *has admitted to a flawed corporate culture that failed to provide a checks and balances approach to combat criminal practices*," said U.S.  Attorney Ferrer.  "*Western Union's failure to implement proper controls and discipline agents that violated compliances policies enabled the proliferation of illegal gambling, money laundering and fraud-related schemes. Western Union's conduct resulted in the processing of hundreds of millions of dollars in prohibited transactions*.  Today's historic agreement, involving the largest financial forfeiture by a money service business, makes it clear that all corporations and their agents will be held accountable for conduct that circumvents compliance programs designed to prevent criminal conduct."

"The U.S. Postal Inspection Service has been at the forefront of protecting consumers from fraud schemes for many years," said Inspector in Charge Bosch. "When private businesses participate in the actions that Western Union was involved in, it makes it easier for criminals to victimize innocent citizens. Our commitment to bringing these criminals to justice will not waiver, and we look forward to facilitating compensation to victims."

"Los Angeles-defendant Wang's company was considered to be among the largest Western Union agents in the United States as over $310 million was sent to China in a span of five years, half of which was illegally structured and transmitted using false identification," said Assistant Director in Charge Fike.  "*Rather than ensuring their high volume agents were operating above-board, Western Union rewarded them without regard to the blatant lack of compliance and illegal*

*practices taking place*. This settlement should go a long way in thwarting the proceeds of illicit transactions being sent to China to fund human smuggling or drug trafficking, as well as to interrupt the ease with which scam artists flout U.S. banking regulations in schemes devised to defraud vulnerable Americans."

"As a major player in the money transmittal business, Western Union had an obligation to its customers to ensure they offered honest services, which include upholding the Bank Secrecy Act, as well as other U.S. laws," said Chief Weber. "*Western Union's blatant disregard of their anti-money laundering compliance responsibilities was criminal and significant*. IRS-CI special agents – working with their investigative agency partners – uncovered the massive AML compliance failures and is proud to be part of this historic criminal resolution."

"Today's announcement of this significant settlement highlights the positive result of HSI's collaboration with our partner agencies to hold *Western Union accountable for their failure to comply with bank secrecy laws that preserve the integrity of the financial system of the United States*," said Special Agent in Charge Miller. "As a result of this settlement, Western Union now answers for these violations. I thank the Office of Inspector General for the Board of Governors of the Federal Reserve System and the Consumer Financial Protection Bureau for their partnership in this investigation."

*According to admissions contained in the deferred prosecution agreement (DPA) and the accompanying statement of facts, between 2004 and 2012, Western Union violated U.S. laws – the Bank Secrecy Act (BSA) and anti-fraud statutes – by processing hundreds of thousands of transactions for Western Union agents and others involved in an international consumer fraud scheme*.

As part of the scheme, fraudsters contacted victims in the U.S. and falsely posed as family members in need or promised prizes or job opportunities. The fraudsters directed the victims to send money through Western Union to help their relative or claim their prize. *Various Western Union agents were complicit in these fraud schemes, often processing the fraud payments for the fraudsters in return for a cut of the fraud proceeds*.

*Western Union knew of but failed to take corrective action against Western Union agents involved in or facilitating fraud-related transactions*. Beginning in at least 2004, Western Union recorded customer complaints about fraudulently induced payments in what are known as consumer fraud reports (CFRs). In 2004, Western Union's Corporate Security Department proposed global guidelines for discipline and suspension of Western Union agents that processed a materially elevated number of fraud transactions. In these guidelines, the Corporate Security Department effectively recommended automatically suspending any agent that paid 15 CFRs within 120 days. Had Western Union implemented these proposed guidelines, it could have prevented significant fraud losses to victims and would have resulted in corrective action against more than 2,000 agents worldwide between 2004 and 2012.

Court documents also show Western Union's BSA failures spanned eight years and involved, among other things, *the acquisition of a significant agent that Western Union knew prior to the acquisition had an ineffective AML program and had contracted with other agents that were facilitating significant levels of consumer fraud*. Despite this knowledge, Western Union moved forward with the acquisition and did not remedy the AML failures or terminate the high-fraud agents.

Similarly, Western Union failed to terminate or discipline agents who repeatedly violated the BSA and Western Union policy through their structuring

- 28 -

activity in the Central District of California and the Eastern District of Pennsylvania. The BSA requires financial institutions, including money services businesses such as Western Union, to file currency transaction reports (CTRs) for transactions in currency greater than $10,000 in a single day.  To evade the filing of a CTR and identification requirements, criminals will often structure their currency transactions so that no single transaction exceeds the $10,000 threshold.  Financial institutions are required to report suspected structuring where the aggregate number of transactions by or on behalf of any person exceeds more than $10,000 during one business day. *Western Union knew that certain of its U.S. Agents were allowing or aiding and abetting structuring by their customers.  Rather than taking corrective action to eliminate structuring at and by its agents, Western Union, among other things, allowed agents to continue sending transactions through Western Union's system and paid agents bonuses.  Despite repeated compliance review identifying suspicious or illegal behavior by its agents, Western Union almost never identified the suspicious activity those agents engaged in in its required reports to law enforcement*.

Finally, Western Union has been on notice since at least December 1997, that individuals use its money transfer system to send illegal gambling transactions from Florida to offshore sportsbooks.  Western Union knew that gambling transactions presented a heightened risk of money laundering and that *through at least 2012, certain procedures it implemented were not effective at limiting transactions with characteristics indicative of illegal gaming from the United States to other countries*.

Western Union entered into a DPA in connection with a two-count felony criminal information filed today in the Middle District of Pennsylvania charging Western Union  with willfully  failing to maintain an effective AML program and aiding and abetting wire fraud. Pursuant to the DPA, Western Union has agreed to forfeit $586 million and also agreed to enhanced compliance obligations to prevent a repeat of the charged conduct, including creating policies and procedures:

- for corrective action against agents that pose an unacceptable risk of money laundering or have demonstrated systemic, willful or repeated lapses in compliance;

- that ensure that its agents around the world will adhere to U.S. regulatory and AML standards; and

- that ensure that the company will report suspicious or illegal activity by its agents or related to consumer fraud reports.

In a related case, Western Union agreed to settle charges by the FTC in a complaint filed today in the U.S. District Court for the Middle District of Pennsylvania, alleging that the company's conduct violated the FTC Act. *The complaint charges that for many years, fraudsters around the world have used Western Union's money transfer system even though the company has long been aware of the problem, and that some Western Union agents have been complicit in fraud.  The FTC's complaint alleges that Western Union declined to put in place effective anti-fraud policies and procedures and has failed to act promptly against problem agents.  Western Union has identified many of the problem agents but has profited from their actions by not promptly suspending and terminating them*.

In resolving the FTC charges, Western Union agreed to a monetary judgment of $586 million and to implement and maintain a comprehensive anti-fraud program with training for its agents and their front line associates, monitoring to detect and

prevent fraud-induced money transfers, due diligence on all new and renewing company agents, and suspension or termination of noncompliant agents.

The FTC order prohibits Western Union from transmitting a money transfer that it knows or reasonably should know is fraud-induced, and requires it to:

- block money transfers sent to any person who is the subject of a fraud report;

- provide clear and conspicuous consumer fraud warnings on its paper and electronic money transfer forms;

- increase the availability of websites and telephone numbers that enable consumers to file fraud complaints; and

- refund a fraudulently induced money transfer if the company failed to comply with its anti-fraud procedures in connection with that transaction.

In addition, consistent with the telemarketing sales rule, Western Union must not process a money transfer that it knows or should know is payment for a telemarketing transaction. The company's compliance with the order will be monitored for three years by an independent compliance auditor.

Since 2001, the department has charged and convicted 29 owners or employees of Western Union agents for their roles in fraudulent and structured transactions. The U.S. Attorney's Office of the Middle District of Pennsylvania has charged and convicted 26 Western Union agent owners and employees for fraud-related violations; the U.S. Attorney's Office of the Central District of California has secured a guilty plea from one Western Union agent for BSA violations, and the U.S. Attorney's Office for the Eastern District of Pennsylvania has secured guilty pleas for BSA violations of two other individuals associated with Western Union agents for BSA violations.

83.    In addition, the FTC issued a release on January 19, 2017, entitled "$586 million Western Union settlement:  Be careful about the company your company keeps," stating that Western Union's in-house data documented the numerous fraudulent complaints the Company received between 2004 and 2015.  The release stated in pertinent part:

### $586 million Western Union settlement: Be careful about the company your company keeps

\*         \*         \*

*For example, between 2004 and 2015*, Western Union received 146,909 complaints about bogus online purchases, totaling at least $187 million in losses. Fraudulent lotteries accounted for another 75,543 complaints, totaling $86 million in losses.  And those "Wire money to get me out of jail!" scams that target unsuspecting family members generated 41,897 complaints and at least $73 million in losses.

Of Western Union's total network of 515,000 agents, the FTC says a small number account for the vast majority of consumer complaints.  You'll want to read the complaint for details, but here's just one example.  In 2012, Mexico had 17,710 Western Union agent locations, but 137 – less than 1% of them – accounted for more

than 80% of the reported fraud. And those are stats based on Western Union's own documents.

Sky-high consumer complaint rates were just the start. Thirty-nine Western Union agents have been charged in the U.S. and Canada for crimes like mail fraud, wire fraud, or money laundering, with more than 100 arrested by law enforcement agencies in other countries. Some were prosecuted for being in cahoots with con artists. Others were charged with setting up their own scams.

But even in the face of consumer complaints, criminal prosecutions, a 2005 settlement with AGs from 47 states and the District of Columbia, a 2009 FTC action against competitor MoneyGram, and warnings from the U.S. Secret Service and authorities in Canada, Japan, the U.K., Spain, and elsewhere, the FTC says it was business as usual for Western Union. In certain countries where Western Union was at a particularly high risk for use by criminals – Nigeria, for example – *Western Union had rarely, if ever, terminated an agent for fraud as of October 2015*.

84.   According to the FTC's complaint against Western Union, dated January 19, 2017, and published on the FTC's website, "between January 1, 2004 and August 29, 2015, Western Union received at least 550,928 complaints about fraud-induced money transfers, totaling at least $632,721,044." The complaint stated in pertinent part:

> *Western Union maintains a database of complaints it receives about fraud-induced money transfers. Based on information in that database, between January 1, 2004 and August 29, 2015, Western Union received at least 550,928 complaints about fraud- induced money transfers, totaling at least $632,721,044*. Over 80% of the complaints in the database were from U.S. consumers. The average individual consumer fraud loss reflected in that database was approximately $1,148. That is more than three times the amount of Western Union's average money transfer for the years 2010 through 2014 – approximately $346 – and more than seven times the amount of Western Union's median money transfer for the same period – approximately $162.

85.   Over the next several days, additional information continued to come out about the Company's settlements with various regulators and the widespread misconduct of its employees and agents. For example, on January 31, 2017, it was announced that 49 states and the District of Columbia had settled with the Company for $5 million to resolve a multi-state investigation into how scammers used the Company's wire transfer services to defraud consumers.

86.   On this news, which was revealed over several days, the price of Western Union shares fell $2.31 per share, or over 10%, to close at $19.54 per share on February 1, 2017, damaging investors.

87.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

88.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Western Union, their control over, and/or receipt of Western Union's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Western Union, participated in the fraudulent scheme alleged herein.

89.     Furthermore, pursuant to the DPA, Western Union "admits, accepts, and acknowledges that . . . the allegations described in the Information and the facts described in Attachment A [the Statement of Facts] are true and accurate." In the Statement of Facts, Western Union admitted that its

> conduct included employees . . . (2) repeatedly identifying Western Union Agents involved in or facilitating unlawful structuring but knowingly failing to take corrective action; (3) failing to adequately implement and maintain effective policies and procedures to discipline, suspend, terminate or take effective corrective action against Western Union Agent locations that repeatedly violated the Bank Secrecy Act and other statutes or Western Union anti-money laundering or anti-fraud policies; . . . or (6) failing to file Suspicious Activity Reports ("SARs") identifying Western Union Agents as suspicious actors.

## LOSS CAUSATION/ECONOMIC LOSS

90.     During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Western Union publicly traded securities and operated as a fraud or deceit on Class Period purchasers of Western Union securities by misrepresenting the Company's business and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became

apparent to the market, the prices of Western Union securities fell precipitously, as the prior artificial inflation came out of the prices over time. As a result of their purchases of Western Union securities during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

91.   Western Union's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

92.   The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Western Union who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## CLASS ACTION ALLEGATIONS

93.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired Western Union publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

94.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of October 28, 2016, Western Union had over 484 million shares of stock outstanding, owned by hundreds if not thousands of persons.

95.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     whether the Exchange Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the prices of Western Union securities were artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

96.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

97.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

98.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

99.     Plaintiff incorporates ¶¶1-98 by reference.

100.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

- 34 -

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Western Union securities during the Class Period.

102.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Western Union securities.  Plaintiff and the Class would not have purchased Western Union securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

103.    Plaintiff incorporates ¶¶1-102 by reference.

104.    The Individual Defendants acted as controlling persons of Western Union within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Western Union common stock, the Individual Defendants had the power and authority to cause Western Union to engage in the wrongful conduct complained of herein.  Western Union controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding plaintiff and the members of the Class damages, including interest;

C.      Awarding plaintiff's reasonable costs and attorneys' fees; and

- 35 -

    D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

    Plaintiff hereby demands a trial by jury.

Dated: February 22, 2017          KAUFMAN, COREN & RESS, P.C.


HOWARD J. KAUFMAN (PA ID 09741)
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Telephone: 215/735 8700
215/735 5170 (fax)
HKaufman@kcr-law.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID C. WALTON
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

LAW OFFICES OF MICHAEL TOBIN
MICHAEL J. TOBIN
29 W. Main Street
Honeoye Falls, NY 14472
Telephone: 585/624-3311

Attorneys for Plaintiff

JS 44 (Rev. 08/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UA LOCAL 13 PENSION FUND, Individually and on Behalf of All Others Similarly Situated | THE WESTERN UNION COMPANY, HIKMET ERSEK, SCOTT T. SCHEIRMAN, and RAJESH K. ARGAWAL |

**(b)** County of Residence of First Listed Plaintiff   Monroe County, New York
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Englewood, Colorado
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
HOWARD J. KAUFMAN, Kaufman, Coren & Ress, P.C.
2001 Market St., Ste. 3900, Philadelphia, PA 19103
215-735-8700

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine ☐ 345 Marine Product Liability | Liability **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark **SOCIAL SECURITY** | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | Leave Act ☐ 790 Other Labor Litigation | | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty **Other:** | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other ☐ 550 Civil Rights | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: <br> 15 U.S.C. § 78j(b) <br> Brief description of cause: <br> Class action alleging violations of federal securities law. |
|---|---|
| VII. REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.     DEMAND $     CHECK YES only if demanded in complaint: <br> JURY DEMAND: ☒ Yes ☐ No |
| VIII. RELATED CASE(S) IF ANY | *(See instructions):*    JUDGE            DOCKET NUMBER |

DATE   2/22/17

SIGNATURE OF ATTORNEY OF RECORD   *Howard J Kaufman*

**FOR OFFICE USE ONLY**

RECEIPT #       AMOUNT       APPLYING IFP       JUDGE       MAG. JUDGE

# ATTACHMENT A

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

UA LOCAL 13 PENSION FUND ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Sanchez v. Centene Corp., et al.*, No. 2:16-cv-08469 (C.D. Cal.)

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages)

directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _8_ day of February, 2017.

UA LOCAL 13 PENSION FUND

By: _____

Steven Ostrander, Fund Manager

- 2 -

WESTERN UNION

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 07/19/2012 | 59,540 | $16.97 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 02/21/2013 | 37,328 | $14.01 |
| 02/22/2013 | 22,212 | $14.02 |